at all. I believe we've got Mr. Magg and is it Miss Citron? Is that correct? Okay. Mr. Magg, are you ready to proceed? Thank you, Ron. Go right ahead. May it please the court, counsel. My name is Thomas Magg. I represent Stephanie Wilson. This is a case challenging Illinois' ban on the retail, commercial, licensed dealer sale and or manufacturer of zinc-based handguns, pistols, revolvers. Under the Second Amendment to the United States Constitution, as incorporated by the 14th Amendment per the U.S. Supreme Court, there is a constitutional right, of course, to keep and bear arms, which is inclusive of handguns. It is unconstitutional per the U.S. Supreme Court in the Heller decision to ban handguns. What we have here is a ban on common, ordinary handguns that simply happen to be less expensive than others. There are handguns that have a frame, barrel, slide, or other major part that has a certain percentage made out of zinc, which is a relatively low-cost material. They're easy to manufacture is the that way. This was passed several decades ago, admittedly before the Heller decision, but it's still on the books. What year was it passed? 1973, I believe. So over 50 years ago. Thereabouts, yes. Yes, to do the math in my head, yes, sir. Last year would have been 50 years. Yes. And while the ban does not prohibit the possession of these firearms, 1973 they didn't go round them all up and say turn them in, it does prohibit the most reasonable source of handguns, i.e. federally licensed dealers, federally licensed firearm manufacturers, from transferring them. It's not as though that an Illinois citizen could go to Missouri or Kentucky or Indiana to buy one, because federal law limits the purchase of handguns to the state of your residence. So if you can't buy a handgun in your state of residence legally from a licensed dealer, ipso facto, you either have to make it yourself or do without. The purpose of the statute is best contained in the language of then Mr. Kaczynski. Mr. Speaker, ladies and gentlemen of the house, this is a piece of legislation to outlaw so-called junk guns or Saturday night special. This imposes a direct prohibition on the sale of a class of handguns. And it's further noted, this is a piece of legislation to outlaw certain handguns. Again, as noted in the Heller decision and its progeny, it is unconstitutional to outlaw handguns. This is not a regulation of a commercial sale. This is not some historical analogy. The record of this case shows that guns, zinc-based guns of this type, are commonly used by law-abiding citizens in the United States for self-defense. They're safe to fire. Contrary to what the language of the statute might imply, they don't melt or deform no matter how much you fire them. You might get them to melt or deform if you put them in a blasting furnace, but that's probably true for a steel-based handgun as well. And in fact, the plan for this case was and is seeking to buy a Heritage Rough Rider revolver, which is a .22 caliber cowboy-style revolver. Heritage .22 revolvers, which include this model, account for approximately 4% of the total number of pistols and revolvers sold in the United States in the year 2018. What is the general purchase price range of those pistols? Those particular ones of the record would show somewhere between $130 and $170. So these would be guns that would be available for purchase by people without a lot of means? They're clearly directed to purchasers of limited means, absolutely. And that would be for people that want the guns for self-defense? Correct. So that your argument in the Second Amendment protects people to be able to get guns that are more economical and within a price range? I believe that the Second Amendment limited and not excludes them only from people with a lot of ability to pay for them. It might cost three or four times that. The Second Amendment includes all people, the community of all of us that are here. That includes poor people. The Second Amendment does not only protect the right of the wealthy or only the middle class or only the upper middle class to keep and bear arms. And if a person cannot afford an $800 Glock, for instance, this affords them the opportunity to have a reasonable means of self-defense. And in fact, a .22 revolver, admittedly a different brand, was the very type of handgun at issue in Heller, if you read the decision closely. So the fact that a .22 revolver does not remove it from the ambit of the Second Amendment because Heller says that handgun of Mr. Heller's is and was protected. But I mean, obviously, opposing counsel is going to come right back and say, well, there was evidence that there are guns that are available out there that did not cost very much more than this particular handgun that you're talking about. I'm not trying to steal her thunders, but I'm sure she's going to bring that up. Sure, absolutely. The Heller decision addresses that. In Heller at 128 Supreme Court, 2818, the Supreme Court made clear, quote, it is no answer to say, as petitioners do, that is permissible to ban the possession of handguns so long as the possession of other firearms is allowed. Thus, by analogy, it is no answer to say it's okay to ban zinc-based handguns that cost $20, $30, $40 less because you can get a steel handgun for $20, $30 more. Banning a protected handgun is not allowed, period. The Supreme Court, in its most recent discussion of the Second Amendment, the Bruin case, New York Rifle and Pistol Association v. Bruin, clarified that the appropriate legal framework is not a balancing test that many courts have been using, but rather it provides a two-step test which requires courts to assess whether modern firearm regulations are consistent with the Second Amendment's text and historical understanding. The first part of that is the plain text. Does the plain text apply? And I think the Heller decision answers that. Yes, the plain text protects the right to keep and bear handguns, and if you can't acquire one from the most obvious legitimate source, that's a violation. The Second Amendment does not require you to make your own firearms or buy them on the black market or smuggle them in from out of state. If the plain satisfies that burden, then the second step is the government must demonstrate that the regulation is consistent with this nation's historical tradition of firearm regulation. Quite candidly, the state has cited nothing that suggests there is any historical tradition of banning zinc-based handguns or handguns based on their material of construction. Do you know, counsel, how much zinc is in the gun? In this particular gun? Well, yes. I know there's zinc in the guns, but how much percentage of the gun was zinc? I've got it all over the gun. No, some parts are obviously steel, because zinc is relatively softer than steel, and if you made certain components out of zinc, they wouldn't last particularly long. The suspension itself refers to the handgun having a barrel slide frame or receiver, which is a die casting of zinc alloy, or any other non-homogeneous metal, though metal would be formed at 800 degrees Fahrenheit. It doesn't reference a specific content of zinc, be it a fraction of 1% or 99%. Basically, there are makes and models of firearms out there that aren't die cast, like the statute suggests, and uses this zinc-based alloy. I think one of them, I'm not sure if it's in the record, but it's called ZAMAC, which is an easily manufactured, easy-to-work-with, die-cast-based, zinc-based metal. But the direct answer to your question, the record doesn't answer that question, and I don't know, outside the record, the percentage. But there is no historical regulation, no historical analogy of regulation at all. Dealing with how handguns or other firearms are manufactured. The earliest of these statutes appear to have originated in the United States in, I'll say, 1968, 1969, with Illinois following on by 73, or thereabouts. Is there any case law that has held any of these statutes unconstitutional? Nothing I'm aware of. The Supreme Court hasn't addressed it. The Illinois courts apparently have not addressed it. In Illinois, it appears to be an issue of first impression, other than, as generally relates to handguns. Well, I would assume if there was, you'd be citing it. Absolutely. If there was something out there, you would be citing it. If there was something out there, either the statute would have already been declared unconstitutional, or it already would have been affirmed that I wouldn't be here right now. The state is arguing, however, that there is a historical analogy for regulating the physical characteristics of firearms related to what you can carry. Go ahead. This is not a concealed carry case. We're not saying that the statute prohibits the firearms being, it appears that, thank you, does not prohibit the firearms being carried by licensed concealed carry holders. The statute prohibits the ability to acquire them, and thus, without the ability to acquire the firearms, the right to keep and bear that firearm is simply illusory. If it's in somewhere, and I apologize, I'll be honest, I haven't had a chance to look through this record completely. I've been a little bogged down with pre-trial fairness the last few weeks. I've heard of it. So, the reason, or if you can tell me, the reason that these zinc-based guns were banned, is it because that they had a tendency to maybe explode, or something might happen to the gun that might put the user in harm from, if it didn't work properly, something would blow back. Is that the reason? I understand the question. The answer is no. The record in this case is truthful. There's the affidavit of Scott Pulaski, which is addressed in the brief, that states that he is familiar with these firearms. Scott Pulaski owns a firearms dealership. I think they're a licensed manufacturer as well, that he has fired them, that they're safe to fire, so on and so forth. There is nothing in the legislative history, or anywhere else in the record that would suggest that they blew up or were dangerous to the operator. It appears that the sole and exclusive reason that these were banned is because urban youths were buying them because they were inexpensive. Okay. And again, because when I did try to look through it, obviously you quoted from the legislation when they were doing that. I mean, it's basically three or four sentences. Yes. That's all I could find. That's basically it. I quote what I can find. Okay. Before we move on, and obviously, Mr. Frank, you'll have your opportunity for your rebuttal. Do you have any questions? This is what? Yeah. After reading the Appleby brief, the main portion of that brief was about you waving or forfeiting a lot of arguments because there was no objection that was handled by motion for you in the trial court. Did you answer those questions? There were cross motions for summary judgment. I moved for summary judgment. After that, the state moved for summary judgment. I relied on my summary judgment brief and argument as a reason why there were summary judgments. So you say that's in a summary judgment brief in the record? Yes. Okay. I have no further questions. All right. Thank you. Counsel, you heard my last question. Would you handle that when you... I'll let you do your introduction. Yeah. Sorry. Thank you. Good morning, Your Honors Counsel. May it please the court. Assistant Attorney General Chaya Citrin on behalf of Brendan F. Kelly, the director of the Illinois State Police. This court should uphold the circuit court's order granting summary judgment for the director on Wilson's claim that the zinc alloy statute facially violates the Second Amendment because Wilson did not meet her burden to show that the restriction falls within the plain text of the Second Amendment. And even if she had, the restriction is analogous to historical regulations limiting the types of firearm possession. As an initial matter, Wilson is not challenging the judgment as to her claims regarding application fees for firearm owner identification cards or for a concealed carry license or the claims concerning defendants other than the director of ISP. Counsel, when this law was passed in 1973, what was the stated purpose of it? The stated purpose, the draft industry shows, was to limit the sale of junk guns. That's what we... Wasn't it to prevent handguns being in the hands of criminals in Chicago to try to keep them from maybe making them more expensive? It's unclear from the record here. I think as all that we can see in the record is the drafting history showing that the purpose was to limit junk guns. But that also then makes it more difficult for a poor person to purchase a gun to defend himself if this is the type of gun they want. Potentially, that could be the case. But here, for several reasons, that is not really the issue. Firstly, although Wilson initially raised an as-applied Second Amendment challenge to the zinc alloy statute saying that she could not afford a handgun other than a zinc alloy handgun, she forfeited any as-applied challenge by not arguing facts regarding her own individual on appeal. And she also waived any state constitutional challenge by not raising it in the circuit court, and she also abandoned any such argument in her reply brief. Sorry? You said waived, but I think you mean forfeited. Well, she didn't. She waived it because she never raised it in the circuit court. But that's forfeiture, not waiver. Okay, you're on it. Yes. Waiver is the affirmative waiver of a known right. Correct. And forfeiture is clearly a medical right, and I'm not raising it. That's correct, Your Honor. So here, as for the merits, though, of the facial Second Amendment challenge, the statute prohibits the manufacturer or the sale of a handgun made of zinc alloy or of another alloy that will melt or deform at less than 800 degrees Fahrenheit. I don't know what percentage of the alloy is made from zinc versus another metal. I don't believe that the record reflects that. To avoid summary judgment on that facial claim, which is a very difficult claim to succeed on because you have to show no set of circumstances under which the statute would be valid, Wilson needed to satisfy the two part framework from Bruin for a Second Amendment challenge. First, she needed to show that the plain text covers the regulated conduct. And even if she were able to show that, the statute would still be constitutional if the restriction is consistent with the historical tradition of firearm regulation. And here, summary judgment was proper at the first step of that, of the Bruin inquiry, because the regulated conduct is not the possession of firearms, which is protected by the Second Amendment, the right to keep and bear arms, but instead the regulated conduct is the manufacture and sale of handguns. And that falls outside the Second Amendment's plain text because the Supreme Court has consistently recognized that laws imposing conditions and qualifications on the commercial sales of arms are presumptively lawful. The Court recognized that in Heller, and again, repeated that in McDonald, and then in his concurrence to the decision of Bruin, Justice Kavanaugh repeated the same. I have one question. You talk about 800 degrees Fahrenheit melt. Is it melting, or you can deform, or what is it? So the statute says both. It says either that would melt... I'm trying to figure out where they came up with 800 degrees. Where'd that come out of? I'm not sure. Is that ever used in any kind of evidence whatsoever? I don't believe the record contains that evidence, but from... Because the stock would be gone, and the hand grips would be gone. Right. I would guess. Right. I think that the record doesn't reflect it. Based on my own understanding, I think that's because zinc alloy melts at slightly less than 800. That alloy. Any other alloys melt at 800? I'm not certain of that, and I don't think the record... Do they have a test for that, where they take all weapons that are manufactured, and they take a manufactured weapon, make it 800 degrees, and then, okay, that passes, and the rest don't? So that can't be sold? The state police does not, as far as I know, and the record does not reflect that the state police runs those sorts of tests. So here, to overcome the presumptive constitutionality... Well, I have another question. How many times could you shoot this weapon to get it to 800 degrees? I would guess never. The record doesn't reflect it, so I don't know either. And if that's the case, you can't pick it up at 800 degrees, could you? Unless you had a big, insulated glove. So that's what I... Where did that come from? Your Honor, I don't know. You don't know. I don't... Unfortunately, I don't know. Okay. There's no evidence on that. Correct. So to overcome the presumptive constitutionality of the restriction here, Wilson needed to show that the statute is so restrictive that it threatens the right to possess firearms. And that's because in Heller, the Supreme Court recognized that unusually severe restrictions that would totally ban handgun possession violate the Second Amendment. But here, as was alluded to previously, there is no evidence that the Zingallo statute threatens the right to possess handguns. The undisputed evidence shows that steel handguns are readily available and that Wilson's preferred handgun accounts for a trivial share of the market. The Director here submitted an undisputed... There's no evidence in the record that there are steel handguns at this price. There's evidence that they're available at about $20 more than Zingallo handguns, so at a very similar price. And again, Wilson has forfeited, abandoned any as-applied challenge based on her own finances. So the Director submitted an undisputed declaration from a licensed firearms manufacturer that steel handguns of comparable and much better quality are sold at $20 more than Zingallo handguns. And as I mentioned earlier, Wilson's preferred handgun accounts for 4% of all handguns manufactured. Only 4% of all handguns manufactured in 2018. There are lots of other handguns that are available. So on that record, Wilson failed to overcome the statute's presumptive constitutionality because a jury could not reasonably find that the statute meaningfully constrains one's ability to possess handguns. And even had she succeeded at the first step of Bruin's inquiry to show that the Second Amendment's plain text covers the regulated conduct, which she did not, summary judgment was proper at step two because the Director showed that the restriction here is consistent with the historical tradition of regulating types of weapons that citizens may possess. For example, in Bruin, the Court recognized the historical tradition of prohibiting the concealed carry of small weapons. So that's just an example of a tradition of regulating the another district in the state held that as long as a statute does not compel an absolute ban and imposes a significant burden on the right of self-defense, the statute passes constitutional muster at step two of the Bruin inquiry. Here, there is no significant burden because many other handguns remain available. So in sum, the Director requests that this Court affirm the Circuit Court's judgment. Before we let you go, Kat, so I'm pretty positive when you go down from Chicago you didn't expect questions on metallurgy today from Justice Welch. I would think that Mr. Patwood either, so I understand the fluster on that. I just want to make sure I know before you got started, Justice Welch was going to ask some questions, but I think you answered those regarding the forfeiture and whatnot. I just wanted to make sure any questions about that were answered. No, well, I just want to ask one more question. Is there, on metallurgy basically, are there any other parts of any other weapons that would melt at 800, would disarm, I guess, or melt? I don't know what the statute says. I'll have to go over that at 800 degrees Fahrenheit. I don't know, Your Honor. And I mean, I guess they exclude stocks, any wooden, any plastic or wooden parts of the weapon. I'm not certain. I have to, let me double check the language of the statute on exactly which parts of the gun. They might not test all the parts, just certain parts. Right, so it applies to a handgun that contains a barrel, slide, frame, or receiver that's made of a zinc alloy or another alloy that would melt that below. And a slide is really not part of, it's not the hot part of a weapon, I wouldn't think. So who cares? You know, I don't understand that at all. Your Honor, I don't know. All we have is the drafting history, that's the line. By the way, on that trip, you had a nice day to drive from Chicago. I did, thank you. Well, and obviously, we appreciate you coming all the way down to be with us today. I don't know, we're completely off on left field. I don't know if you know this. Have you ever been in this courthouse before? I have not. Just before you leave here today, I would suggest you look around. If you did not know this, you are standing where Abraham Lincoln did the last time he argued in front of the Supreme Court before he went to politics. So this courthouse, my hair goes up on my arms when I just say that. So, have a lot of history here. We welcome you here. We hope when you leave here, it's a beautiful courthouse. You know, take these members with you and we hope to see you soon. Thank you. Thank you. Sorry for the history lesson, Mr. Mack. I know you were aware of that, but... I was, yes. And it is good to actually be back in person arguing, I should add. I did the first Zoom hearing when the pandemic started with this court. But other than the traffic on 57, it is a place to be back here, I will say that. I will not argue with you. So go right ahead. All right. The record in this case, and this is at C872, is the affidavit of Mr. Pulaski, a firearms dealer, that firearms are safe to fire and will not melt or deform after ordinary use or even after extreme use. Basically, you can't fire these pistols enough to make them melt or deform and comply with the laws of physics. It is my belief that the reason that they chose to answer the question of your honor, the 800 degree, is I believe that is close to the melting point of zinc. I don't know that, but I strongly suspect that. The statute does only apply to handguns with barrel, slides, frame, or receivers, which is the die casting. Obviously, that wouldn't include pins, springs, hammers, so on and so forth. Basically, it would be the more expensive parts of a handgun, traditionally. The purpose of the statute is to ban handguns. The legislature didn't think they could get a It's unconstitutional under Heller. It's unconstitutional under Bruin. It's unconstitutional for rich people. It's unconstitutional for poor people. The factual allegations in the complaint related to my client's financial status was to show standing, so that the state could not come in and say, well, you've got plenty of money. It doesn't matter anyway. Yes, she's poor. Be But again, the statute is unconstitutional for everybody. That's why this is a facial challenge. Heller was a facial challenge. The city of Chicago case was a facial challenge. That's where the second amendment was incorporated. Bruin, a facial challenge. There is no circumstance where this ban is constitutional. Now, I would concede, if this statute was passed, to ban firearms that had weak barrels that tended to explode with industry standard ammunition, we might have something else to argue about. We're not talking about firearms that are dangerous to the operator. We're simply talking about firearms that the legislature in 1973 wanted to ban, did ban, but under the Supreme Court, cannot ban. Thank you.